**DETROIT BANK AND TRUST COMPANY, as Guardian for Roxanne Scott, Plaintiff,**

v.

**CHICAGO FLAME HARDENING COMPANY, INC., Defendant.**

Civ. No. H 77–328.

United States District Court,
N. D. Indiana,
Hammond Division.

June 24, 1982.

Anthony DeBonis, Jr., Murphy, McAtee, Murphy & Costanza, East Chicago, Ind., for plaintiff.

**1280**

Fred W. Grady and Martin Kinney, Merrillville, Ind., for defendant.

## MEMORANDUM DECISION
## AND ORDER

LEE, District Judge.

### Introduction

This matter was tried before the Honorable Phil M. McNagny, Jr. without the intervention of a jury on December 22 and 23, 1980. Following the close of evidence, the parties were to submit Post Trial Briefs, proposed Findings of Fact and Conclusions of Law in anticipation of the later scheduling of final argument. However, Judge McNagny became incapacitated before such arguments could be held, and passed away without rendering a final decision in this instant case.

At the suggestion of the Court, counsel for both parties subsequently met and by joint motion of June 18, 1981 communicated their agreement that this matter should be decided upon an examination of the transcript of testimony, an examination of the admitted exhibits, and the briefs of the parties, together with final oral argument which a successor Judge might hear. As a condition of this motion, all rights which either party might assert under Trial Rule 63, Federal Rules of Civil Procedure, the due process clause of the Constitution, or upon any other ground, were specifically waived. This stipulated agreement was adopted by the Court in its Order of August 24, 1981 which set final argument on September 1, 1981. This Court, having considered the entire record and being fully advised following said argument, hereby renders and enters the following Memorandum Opinion and Order pursuant to Rule 52(a), Federal Rules of Civil Procedure. The relevant facts as revealed by the record and adduced through the final argument are as follows.

1. Although founded in 1956, Chicago Flame Hardening Company was not incorporated until 1962.

### Findings of Fact

1. Diversity jurisdiction is founded upon 28 U.S.C. § 1332. Both plaintiff, Detroit Bank and Trust Company, acting as guardian for the estate of its ward, and that ward, Roxanne Scott, are citizens of the State of Michigan. The defendant herein, Chicago Flame Hardening Company, Inc., is an Indiana corporation with its principal place of business located in East Chicago, Indiana. The amount in controversy exceeded $83,000 at the commencement of this action.

2. In 1956,[1] Chicago Flame Hardening Company (hereinafter referred to as "Chicago Flame"), was founded in East Chicago, Indiana by Marvin R. Scott, a Michigan domiciliary, and Gainor D. Scott and John R. Keeler, Indiana domiciliaries. Marvin R. Scott was concurrently the sole owner of a highly successful business in that same industry, Detroit Flame Hardening Company, Inc., located in Detroit, Michigan.

3. Marvin R. Scott, although continuing to reside in Michigan, visited the new firm periodically and acted as its President while utilizing his expertise in the flame hardening industry to establish the East Chicago, Indiana operation as an investment and a means of livelihood for his brother, Gainor D. Scott, and brother-in-law, John R. Keeler.

4. On July 29, 1964, Marvin R. Scott, Gainor D. Scott and John R. Keeler, the owners of the entire issue of Chicago Flame's capital stock, unanimously agreed by corporate resolution that upon the death of these specifically named shareholders (M. R. Scott, G. D. Scott and J. D. Keeler), the corporation would pay to his wife, if then living, commencing with the date of her husband's death, a graduated monthly stipend over a fifteen (15) year period totaling $150,300 to terminate in the event of her death if prior to the expiration of the payment period.[2]

2. That resolution which specifically avoided naming the current wives of the signatories provides in pertinent part:

5. The signatories to this 1964 resolution did not expressly reserve the right to alter and/or amend.

6. Despite the fact that the potential beneficiaries of this resolution lacked experience or independent expertise in the flame hardening industry, they were, as recipient widows under the terms of the resolution, to make themselves available for consulting work and to agree not to compete with Chicago Flame for the duration of their receipt of benefits as consideration for the same under this corporate agreement.[3]

7. This 1965 resolution further provided that the capital shares of the then deceased original shareholder be retained in a voting trust with the surviving original shareholders acting as trustees until the death of the last surviving original shareholder.

8. Within a reasonable time following the adoption of this resolution Marvin R. Scott's wife, Roxanne, became aware that this document's beneficial terms were potentially available to her in the future. She then "forgot the whole thing." (Transcript of testimony, December 22, 1980, pp. 19–20).

9. The provisions of the 1964 widow's resolution were initially implemented on July 12, 1967 when Marjorie Scott Keeler signed the requisite statement[4] agreeing to abide by the resolution's consideration requirements, following the July 8, 1967 death of her husband, John R. Keeler.

10. Marjorie Scott Keeler thereinafter continually received a monthly stipend pursuant to the express terms of this agreement, except for an eighteen (18) month period during 1971 and 1972 when she voluntarily consented to a postponement in recognition of Chicago Flame's deteriorating financial posture.

11. Marvin R. Scott's wife, Roxanne, was fully and continuously aware that Marjorie Scott Keeler (her sister-in-law) was receiving the benefits provided by the 1964 resolution for surviving spouses of the original signatories.

12. On February 15, 1971 Marvin R. Scott participated in and approved the adoption of a second corporate resolution along with the other owners of the entire issue of Chicago Flame's capital stock, Gainor D. Scott and Marjorie Scott Keeler. This subsequent agreement was executed to rescind the right of Marvin R. Scott's surviving spouse to receive graduated monthly payments as formerly provided in the 1964 resolution.[5]

13. Marvin R. Scott's motivation for entering into this second resolution was to sustain the future financial integrity of Chicago Flame.

---

"That immediately following the death of each stockholder, his wife, if then living, will be asked to sign a statement agreeing to make herself available at all reasonable times to said corporation as a consultant for same and further agreeing to make available to said corporation any and all knowledge as to the business thereof as revealed to her by her husband during his lifetime including any and all technical know-how, and further agreeing that she will not for a 15 year period following the death of her husband compete with said corporation in any way, directly or indirectly, nor knowingly permit her husband's name, knowledge or reputation to be used in competition with the corporation during said period, in exchange for which undertakings, it is agreed that she shall, commencing with the date of her husband's death be paid a monthly salary by the corporation of $1,250 for the first five year period after her husband's death, a monthly salary of $835 for the second five year period following her husband's death, and a monthly salary of $420 for the third five year period following her husband's death, it being understood and agreed, however, that the aforesaid salary arrangement will take effect only in case said deceased stockholder is survived by his wife and that same will forthwith terminate in the event of her death at anytime prior to the expiration of the aforesaid 15 year period."

3. See note 2, *supra.*

4. See note 2, *supra.*

5. This 1971 rescission resolution provides in pertinent part:

"... For and in consideration of One Dollar in hand paid, Mr. M. R. Scott hereby waives his rights and his wifes (sic) rights, Roxanne Scott, as to Section 1 of the agreement dated July 29th, 1964, stating that the surviving spouse's (sic) shall receive a continuing graduated salary from the Chicago Flame Hardening Company for a period of 15 years following the death of an original stockholder."

14. Following a lengthy period of convalescence, Marvin R. Scott died on October 31, 1971 leaving plaintiff's current ward, Roxanne Scott, as his surviving spouse.

15. Although there remains conflicting testimony, it is the determination of the Court that, while Mrs. Roxanne Scott may not have actually seen the February 15, 1971 rescission document prior to the instigation of this suit, she became aware of her husband's relinquishment of the widow's benefits during the interim following his death and the filing of this suit.[6]

16. Following the death of her husband, Roxanne Scott moved to Florida. Due to a continuing emotional illness, she was adjudicated incompetent by a Florida court and a guardianship was established in March of 1972 which was maintained for approximately two years.

17. Roxanne Scott returned to Michigan in 1975 where she suffered a recurrence of the same mental illness in August of 1975. She remained hospitalized in various facilities until her release in December of 1975. A guardianship was established solely over her estate in November, 1975. This same guardianship remains in force. Although mentally competent today, Mrs. Scott continues to be under a physician's care.

18. Mrs. Roxanne Scott did not request the monthly stipend available to surviving spouses through the 1964 resolution prior to the initiation of this litigation on September 19, 1977; nor was she approached in that regard by Chicago Flame.

19. Mrs. Roxanne Scott made no expenditure, nor did she change position or perform any act in reliance on the 1964 widow's resolution prior to the commencement of this litigation.

20. Following the January, 1977 death of Gainor Scott, Chicago Flame executed the same "consideration" agreement[7] with his widow, Cecelia Scott, as they had previously done with Marjorie Scott Keeler. Thereinafter, Chicago Flame continued to provide benefits to these two fully vested surviving spouses as mandated by the operative terms of the 1964 widow's resolution.

21. On June 16, 1977 Mr. Thomas Farnsworth purchased a majority of Chicago Flame's capital shares from Marjorie Scott Keeler Lanning (since remarried) and Cecelia Scott. At the time of the purchase, Mr. Farnsworth fully perceived the continuing obligation imposed pursuant to the still effective terms of the 1964 resolution and the relief believed provided by Marvin R. Scott's prior rescission of these same benefits.[8]

### Application of Law

Plaintiff initiated this litigation on September 19, 1977 by way of a complaint which seeks to enforce the terms of the 1964 widow's resolution for the benefit of its ward, Mrs. Roxanne Scott. Plaintiff asserts its contentions on the basis of (1) the failure to expressly reserve the right to rescind, (2) a presumption of acceptance for a donee beneficiary, (3) Roxanne Scott's medical condition precluding the earlier assertion of her rights as a means of acceptance, and (4) that this agreement vested a right in its ward which could not be denied by the 1971 rescission. Given the fact that this disputed resolution was executed in Indiana by a domestic corporation of that state, Indiana law clearly controls and will dictate the determination of this matter. *Royal v. Keny Co.*, 528 F.2d 184 (7th Cir. 1975).

The old Restatement rule provided that the promisor and promisee could make no change in the promise made to a donee beneficiary unless such a power is reserved.[9]

6. Defendant's belated Motion to Amend its complaint to raise the defense of laches was denied by Judge McNagny at the opening of trial on December 22, 1980.

7. See note 2, *supra.*

8. See note 6, *supra.*

9. This position promulgated by the initial restatement was not followed by the vast majority of states even at the time of its adoption. The express reservation requirement was thereafter abandoned in tentative drafts and the final adopted version of the Restatement (Second); *see* 2 Williston, Contracts §§ 396–97 (3d Ed. 1959).

Restatement of Contracts § 142 at 168 (1932). Nor could a change be made by the promisor and promisee in their promise to a creditor beneficiary if he has changed his position in reliance on that promise. *Id.; see* Page, *The Power of Contracting Parties to Alter a Contract for Rendering Performance to a Third Person*, 12 Wis.L.Rev. 141, 149–50 (1937). Evolutionary changes in the law, however, have transformed the aforementioned position of the original Restatement. The Second Restatement of Contracts as adopted and promulgated, eliminates this distinction between a donee and creditor beneficiary and recognizes that modification on the part of the promisor and promisee is ineffective only if the agreement so provides, unless the third party beneficiary has changed his position in reliance on the promise or has accepted, adopted or acted upon it. Restatement (Second) of Contracts § 142 (1979). *See also* Note, *Gratuitous Promise*, 6 Val.L.Rev. 353 (1972); 17 Am.Jur.2d Contracts § 317 (1979); 97 A.L.R.2d 1262 (1964).

▮ Indiana specifically reaffirmed its adoption of this majority view[10] as later expressed in the Second Restatement. In the case of *In Re Estate of Fanning*, 263 Ind. 414, 333 N.E.2d 80 (1975), the Indiana Supreme Court examined the posture of a third party beneficiary and determined that the right to rescind or modify a third party beneficiary contract, without the assent of the beneficiary, ceases once the contract is accepted, adopted or acted upon by the third party.

**I**

▮ The plaintiff, on behalf of its ward, asserts that the 1971 rescission was invalid for the parties failed to expressly reserve the right to rescind the 1964 widow's resolution. Indiana has long recognized that even a party without right may rescind a contract if the other party fails to object to it and permits the rescission to occur; such a rescission would be by mutual consent. *Ralya v. Atkins*, 157 Ind. 331, 61 N.E. 726 (1901); *see generally* Corbin on Contracts §§ 772–776 (1951 ed. & Supp. 1980); 3 Williston, *Contracts* § 1826 (3d ed. 1959). In the case of contracts entered into for the benefit of a third party,[11] Indiana follows the rule found in most jurisdictions. That is, the parties to a third party beneficiary contract may rescind, vary or abrogate the contract as they see fit, without the approval of the third party, at any time before the contract is accepted, adopted or acted upon by a third party beneficiary. *Fanning*, 333 N.E.2d at 84; *accord Jackman Cigar Co. v. Berger*, 114 Ind.App. 437, 52 N.E.2d 363 (1944). A rescission prior to the required change in position by a third party deprives that third party of any rights under or because of the contract. *Id.; see* 17 Am.Jur.2d Contracts § 317 (1979).

▮ In this case the 1964 agreement was adopted as a corporate resolution by Chicago Flame Hardening, Inc.[12] All of the officers and shareholders of the corporation approving the initial agreement. On February 15, 1971 the officers and shareholders mutually agreed to rescind the July 29, 1964

---

10. Indiana's enduring maintenance of the majority position is exemplified by the 1896 case of *Richards v. Reeves*, 45 N.E. 624, 626, which recognized

> The rule is *well established* that when one person makes a promise which inures to the benefit of another person, not a party to the contract, such third person may adopt the contract, and enforce it. But the parties to the contract have the right to rescind it before it is accepted, and, if rescinded before acceptance, it cannot be enforced by such third person. (Emphasis added).

11. As neither the general common law nor related statutes from other jurisdictions distinguish between various types of beneficiaries,

between release and rescission, between unilateral and bilateral, or between partially executed and wholly executory contracts, this Court will not. *See* 2 Williston, Contracts, §§ 396–398 (3d Ed. 1959); *see also Holbrook v. Pitt*, 643 F.2d 1261, 1271 (7th Cir. 1981) (while addressing federal common law the three classes of beneficiaries [donee, creditor, and incidental] were disdained in favor of the Second Restatement's two divisions [intended and incidental] which permitted review of intent without further distinction.

12. The parties stipulated that the 1964 corporate resolution was not an *ultra vires* act.

resolution. Recognizing the majority view followed by Indiana, the rescission of the prior agreement is valid without a specific reservation of the power to rescind so. long as the third-party beneficiary, Mrs. Roxanne Scott, had not accepted, adopted or acted upon the original widow's resolution. Therefore, an express reservation of the right to rescind is not required to abrogate the third party beneficiary agreement.[13]

## II

Plaintiff next contends that since Mrs. Roxanne Scott had knowledge of the original 1964 resolution, her acceptance of this beneficial agreement must be presumed. In support of this position plaintiff offers three vintage cases which recognize a presumption of acceptance.[14]

■ These cases are clearly distinguishable from the present cause. The primary and controlling distinction is that while acceptance was presumed in cases cited by plaintiff, the intended beneficiaries were infants at the time of the transaction. A presumption is necessary in such instances to protect the interests of minor beneficiaries. Mrs. Scott, however, was an adult at the time of the 1964 widow's resolution, completely able to assert her own rights, and as such is not afforded the same protection.[15] Moreover, the same authority submitted by plaintiff in support of a presumption of acceptance provides *a fortiori* a

strong argument for the opposite proposition—a lack of such protection for a competent adult through negative implication.

Plaintiff's cases[16] and contention here are effectively nothing more than a camouflaged application of gift theory which recognizes that once a gift is consummated, it remains irrevocable except by consent of the donee. Although the contract theory applicable to this cause has been extended in some instances as an equitable means of avoiding the delivery requirement necessitated by the gift theory, it would be an oversimplification to also attempt to inject into this same contract theory a substitute for acceptance. The determinative legal theory in this matter is therefore a stricter contract theory which does not provide the presumption of acceptance claimed by plaintiff for its beneficiary ward donee.[17] *Fanning*, 333 N.E.2d at 85.

## III

Plaintiff's next focus theorizes that "but for" Roxanne Scott's declining health, she would have instituted this litigation at an earlier date. Plaintiff attempts thereby to utilize its ward's acknowledged mental and physical difficulties as a vehicle to excuse not only the failure to sue before rescission, but also to demonstrate why prompt commencement of this action to preserve her benefits was prevented.[18] The net effect of this proposition is to attempt to transform

---

**13.** Plaintiff also asserts that the 1964 resolution indefeasably vested the survivor's benefit in Roxanne Scott. This position cannot be supported if the right to rescind the agreement remained available to M. R. Scott and Chicago Flame Hardening, Inc.

**14.** *Henderson v. McDonald*, 84 Ind. 149 (1882) bequest; *Pruitt v. Pruitt*, 91 Ind. 595 (1883) completed gift; *Waterman v. Morgan*, 114 Ind. 237, 16 N.E. 590 (1888) express trust.

**15.** Plaintiff did not offer, and the Court did not find, a specific case providing a presumption of acceptance for an adult under either the third party beneficiary contract majority theory, or the rule announced in Section 142 of the original Restatement of Contracts. Generally, the cases address the issue in terms of the old donee-beneficiary and creditor-beneficiary distinction and apply the same rules to donee-beneficiaries as they would normally apply to cred-

itor-beneficiaries. As such, they hold that the rights of an adult third-party donee-beneficiary under an executory contract may be annulled by the principal parties' rescission of that contract or mutual release of their obligations thereunder before the third party accepts the promise made in her behalf or changes her position in reliance on same. *See* 97 A.L.R.2d 1265 (1964).

**16.** See note 14, *supra*.

**17.** The Court has previously acknowledged that the adult status of Mrs. Scott would also deny the presumption under the gift theory.

**18.** The disputed rescission occurred on February 15, 1971. The complaint was filed on September 19, 1977.

this 1977 litigation into a belated substitute for acceptance prior to rescission.

■ Although the Court recognizes that the filing of a suit by a third party beneficiary may be considered as acceptance by that individual, *Zimmerman v. Zehender*, 164 Ind. 466, 73 N.E. 920 (1905); *Blackard v. Monarch*, 131 Ind.App. 514, 169 N.E.2d 735 (1960), the Court may not consider Mrs. Scott's health as dispositive of the issue before it. Perhaps equity might demand some presumption of acceptance had Mrs. Scott been totally incapacitated prior to rescission;[19] however, plaintiff's own evidence makes it clear that the February 15, 1971 rescission took place before Mrs. Scott's inhibiting physical and mental decline occurred and the appointment of guardians to represent her interests.[20]

■ As early as 1903, the Indiana Supreme Court stated that "[A] contract for the benefit of a competent third person may become available to that person, provided that it is not rescinded by the parties thereto before such third person gives notice that he accepts it." *Johnson v. Central Co.*, 159 Ind. 605, 65 N.E. 1028 (1903). Therefore, this Court cannot accept plaintiff's novel preclusion argument. Mrs. Scott was a "competent" adult third party beneficiary at the time of this rescission. Consequently, this Court may not fictionalize the initiation of this suit as an act of acceptance prior to the 1971 rescission.[21] *See Zimmerman, supra*, 73 N.E. at 922.

## IV

The attenuated circumstance surrounding this litigation resulted in the submission of numerous briefs by opposing counsel. Three cases which appear to be somewhat significant to this cause have emerged. However, different interpretations of each have been offered. To resolve this conflict, the Court believes a review of the cases must be provided.

First, the case of *In Re Estate of Fanning*, 263 Ind. 414, 333 N.E.2d 80 (1975) (previously cited), dealt with the ownership of certificates of deposit. Wildus Fanning purchased certificates of deposit which, upon their face, were payable to "Wildus Fanning or Marcella Seavey either of them with the right of survivorship and not as tenants in common." Since the certificates were discovered in Fanning's safety deposit box after her death and since no signature card or deposit agreement had been executed, her daughter (Seavey) could not claim the certificates under a gift theory as there was no actual or constructive delivery. The Indiana Supreme Court held that where a certificate of deposit creates a joint account with rights of survivorship in clear and unequivocal language, donative intent of the donor is presumptively established. The thrust of the holding was that principles of contract law, rather than that of gifts, should be the governing substantive law due to the inherent contractual nature of certificates. The daughter who was unaware of the existence of the certificates until after the death of her mother, was found to be a third party beneficial owner. Therefore, the essence of *Fanning* is that as a third party contract, the donor could rescind during her lifetime; otherwise, the presumptive donative intent could be refuted only by parol evidence of fraud, duress, undue influence or mistake. *See Moore v. Bowyer*, Ind.App., 388 N.E.2d 611, 612 (1976).

---

**19.** Evidence was also submitted to establish a decline in Mrs. Scott's health prior to the death of her husband. However, this period of limited capacity during the nursing of Mr. Scott also took place after the February 15, 1971 rescission.

**20.** Guardianships were established after the death of Mr. Scott to protect and administer the estate of Roxanne Scott. Detroit Bank is appearing in this capacity for its ward, Mrs. Scott. *See* Finding of Fact No. 18.

**21.** Plaintiff also asserts that Mrs. M. R. Scott lacked knowledge of the February 15, 1971 rescission which further delayed filing of this action. The Court notes that even if this condition is correct, prior notice is not a prerequisite to a valid rescission and such notice in most instances is consequently received after rescission was effected, if at all.

■ The Court's reading of *Fanning* does not support plaintiff's contention that knowledge on the part of the donee beneficiary constitutes acceptance. In fact, *Fanning* provides authority for this Court's position concerning rescission by citing with approval 17 Am.Jur.2d Contracts § 314 (1964), which states in part, "[t]he parties to a contract entered into for the benefit of a third person may rescind, vary, or abrogate the contract as they see fit, without the assent of the third person, at any time before the contract is accepted, adopted, or acted upon by him ..." Although *Fanning* acknowledges the right of rescission in third party beneficiary contracts, it is distinguishable from this instant case for rescission was never attempted by the decedent certificate purchase.

The next case for consideration is *Matter of Estate of Bannon*, 171 Ind.App. 610, 358 N.E.2d 215 (1976), which addressed the inheritance tax aspects of an annuity. The decedent accepted employment for a fixed term with a specific salary. The agreement provided that if he died before expiration of the term survived by his wife then the corporation was to pay her $5,000 per year for the balance of the original term. That court in applying an ownership tax theory determined that the decedent did not have an interest in the property which passed to his wife after his death. Again, there was no attempt by the decedent to rescind the annuity agreement. The *Bannon* court questioned whether the widow was a third party beneficiary to the annuity agreement whose rights were vested. Moreover, in a footnote on this point *Fanning* is cited in recognition of the right to modify a third party beneficiary contract. *Bannon, supra,* at 218 n. 7.

The final case for review is *Salesky v. Hat Corporation of America*, 20 A.D. 114, 244 N.Y.S.2d 965 (1963). In *Salesky*, a majority of the shareholders approved a corporate resolution which provided $10,000 for six years to the wife of their president upon his death. The interested wife voted with the majority in adopting the resolution. The contracting parties to this agreement also expressly reserved the right to terminate the agreement upon proper notice. Later, this resolution was amended without shareholder approval by substituting the president's sister as the intended beneficiary. Upon the president's death both his wife and sister claimed to be the equitable beneficiary. The court found for the sister.

This case is also distinguishable for Mr. M. R. Scott and Chicago Flame did not expressly reserve the right to terminate its 1964 resolution and Mrs. Roxanne Scott did not vote to approve the same. Therefore, the language in *Salesky* concerning vested rights and retention of control is not dispositive in this cause.[22]

The Court's review of these cases fails to resolve the decisive question remaining before the Court. Neither plaintiff's assertions concerning acceptance, nor defendant's position on rescission are directly supported by the cases presented. The Court must therefore return to the issue of whether Roxanne Scott accepted, adopted or acted upon the 1964 resolution prior to the 1971 rescission.

V

■ The analysis above establishes that acceptance may not be presumed by this Court and that this contract for the benefit of a third party is enforceable only if the third party beneficiary has accepted, adopted or acted upon it prior to rescission. Because prior decisions fail to provide an adequate definition, the Court must examine the somewhat nebulous term "acceptance" in an effort to identify if some form of assent took place on the part of Mrs. Roxanne Scott if it is to conclude that the 1971 rescission was ineffective and that her derivative rights were preserved. *See e.g., United States v. Winnicki*, 151 F.2d 56, 57 (7th Cir. 1945) (words "receive" and "accept" are legal equivalents).

---

22. The *Salesky* court categorically avoids the conclusion that a gift theory was not utilized in reaching their result. However, the substance of the decision is the donor's retained right to alter the resolution.

Acceptance may be an overt act, or the adoption of a benefit which is a question of intent and thereby also a factual determination. *See* Corbin, *supra*, §§ 782–793; Jones, *Legal Protection of Third Party Beneficiaries: On Opening Courthouse Doors*, 46 Cinn.L.Rev. 313 (1977). Nevertheless, even in instances such as this where plaintiff has provided no specific evidence of an overt act or of a change in position, it must still be remembered that "the power of promisor and promisee to vary the promisor's duty to an intended beneficiary is terminated when the beneficiary manifests assent to the promise in a manner invited by the promisor or promisee." Restatement (Second) on Contracts, *supra*, § 311 at comment (h). This rule utilizes an analogy to the law of offer and acceptance by recognizing that a third party beneficiary may well rely in ways difficult or impossible to prove. *Id.*

Fortunately for this Court, the narrow question currently before it does not present this circumstance characterized by an impossibility of proof. The converse is true as the Court's determination of the factual question regarding Roxanne Scott's intent to accept the benefits afforded by the 1964 resolution was answered in the negative by her own sworn testimony. While facing cross-examination, Mrs. Scott was specifically asked whether she made any long range plans or depended upon the 1964 widow's resolution. Her answer was, "No, I forgot the whole thing." (Transcript of testimony, December 22, 1980, pp. 19–20). In addition to this testimonial controversion, the Court also failed to discern any other corroborative evidence which might sustain plaintiff's claim of acceptance or change in position in reliance on that resolution. *See generally* Note, *The Requirements of Promissory Estoppel as Applied to Third Party Beneficiaries*, 30 U.Pitt.L.Rev. 174 (1968). Furthermore, the Court's position regarding the failure to establish adoptive intent is not gleaned from this single negatory response, but is supported by a detailed review of the entire record.[23] It is

therefore the conclusion of the Court that Roxanne Scott failed to accept, adopt or act upon the 1964 resolution prior to the 1971 rescission. Consequently, the Court must hold that Mrs. Scott's failure to act or rely upon the original agreement extinguished any benefits which might have accrued to her from the 1964 agreement.

### Conclusion

It is the final determination of the Court that Mrs. Roxanne Scott failed to accept, adopt or act upon the 1964 resolution prior to the contracting parties' valid rescission on February 15, 1971.

### ORDER

It is hereby ORDERED that Judgment be entered for the defendant, Chicago Flame Hardening Company, Inc., consistent with this Memorandum Decision and the findings and conclusions herein.

23. Note especially the balance of Mrs. Roxanne Scott's testimony of December 22, 1980.