Audrey PRICE, et al.,
Plaintiffs-Appellants,

v.

Samuel PIERCE, et al.,
Defendants-Appellees.

No. 86–1906.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1987.

Decided July 8, 1987.

Rehearing and Rehearing En Banc
Denied Aug. 4, 1987.

Gerald Brask, Jr., Prairie State Legal Service, Wheaton, Ill., for plaintiffs-appellants.

Darryl M. Bradford, Jenner & Block, Anthony J. Steinmeyer, Dept. of Justice, Civil Div., Howard M. Schmeltzer, Anthony J. Ciccone, Jr., Dept. of Housing and Urban Development, Washington, D.C., for defendants-appellees.

Before WOOD, POSNER, and MANION, Circuit Judges.

POSNER, Circuit Judge.

In 1974 Congress passed a statute "For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). (A "lower-income family" is one whose income is no more than 80 percent of the median family income in the area. 42 U.S.C. § 1437f(f)(1) (1976), now § 1437a(b)(2).) The statute authorized the Department of Housing and Urban Development to subsidize both existing housing (§ 1437f(b)(1)) and newly constructed or substantially rehabilitated housing (§ 1437f(b)(2), repealed in 1983). The second provision is the one in issue here, in particular the language authorizing HUD to "make assistance payments pursuant to contracts with owners or prospective owners who agree to construct ... housing in which some or all of the units shall be available for occupancy by lower-income families...."

To implement this part of the new program (the "economically mixed housing" or "Section 8" program as it is often called), Congress appropriated money to HUD to pass along to state housing agencies, such as the Illinois Housing Development Authority (IHDA), which in turn would give it to developers. The developers would bill IHDA a specified amount for each apartment rented to a lower-income family and IHDA would be reimbursed by HUD.

Between 1975 and 1978 IHDA made and HUD approved contracts with seven developers, who agreed to lease 40 percent (a total of 482) of the apartments in certain apartment complexes in the Chicago suburbs to lower-income families, in exchange for rent subsidies under section 1437f(b)(2); the developers also received mortgage subsidies from IHDA. But then IHDA let developers reduce the percentage of apartments rented to lower-income families to 20 percent. The developers got no rent subsidies from IHDA (financed by HUD) on any of the apartments not rented to lower-income families but they still had the benefit of the mortgage subsidies from IHDA, for these subsidies were not tied to the percentage of units rented, or committed to be rented, to such families. Moreover, the more developments over which HUD's subsidies are spread (because the lower the percentage of lower-income housing in each development), the higher are HUD's costs of administering the Section 8 program, though not its subsidy costs.

In 1981 Congress amended the statute to require developers to fulfill their contractual commitments to rent to lower-income families; until then, as we shall see, federal law did not condition entitlement to Section 8 subsidy on the developer's adhering to its commitment. The amendment does not affect contracts made before 1981. See Act of Aug. 13, 1981, Pub.L. 97–35, §§ 325(1), 371(b), 95 Stat. 357, 406, 431. Nor does the repeal of section 1437f(b)(2) in 1983 affect this case. See Act of Nov. 30, 1983, Pub.L. 98–181, § 209(a)(2), 97 Stat. 1153, 1183.

This suit was brought in 1983 by five persons who earlier that year had made inquiries about the availability of subsidized apartments at three of the six developments, and by an organization that as-

sists lower-income families to find housing. The defendants are the developers, plus the heads of HUD and IHDA. The individual plaintiffs had been told there were no vacancies and had been placed on waiting lists. Only two of them bothered to fill out an application to rent, both at the same development. The suit claims that the individual plaintiffs are third-party beneficiaries of the contracts between IHDA and the developers, that the developers broke the contracts and HUD refused to enforce them, that IHDA violated section 1437f(b)(2), and that IHDA and HUD deprived the individual plaintiffs of property without due process of law. The district court rejected these claims and (so far as pertinent to this appeal) entered judgment for the defendants, after holding that the plaintiffs had standing to bring this suit and after certifying it as a class action on behalf of all similarly situated persons. 615 F.Supp. 173 (N.D.Ill.1985).

 The first issue is whether the plaintiffs have standing to sue. The standing of the organization, and of the three individual plaintiffs who never bothered to fill out formal applications, is doubtful but need not be resolved; it is enough, to give us jurisdiction over the case, if one of the plaintiffs has standing. *Secretary of the Interior v. California*, 464 U.S. 312, 319 n. 3, 104 S.Ct. 656, 660 n. 3, 78 L.Ed.2d 496 (1984). The two who filled out applications do. True, if only they are proper plaintiffs, then among the developer defendants only the one to whom those two plaintiffs applied has an actual controversy with a party, and the other developers should be dismissed from the suit. But as we shall be dismissing the suit anyway, it seems unnecessary and ill-advised to get involved in difficult questions of standing that would neither change the outcome nor enable us to avoid a discussion of the merits. A further point is that this suit was certified as a class action, and perhaps the best way to view the named plaintiffs is as candidates for class representative. If at least one plaintiff had standing when the suit was brought and certified as a class action, and if continuously after that there was a live controversy between at least one de-

fendant and one member of the class (not necessarily a named plaintiff), there is federal jurisdiction. *Sosna v. Iowa*, 419 U.S. 393, 402, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975). These conditions are satisfied here.

In contesting the standing of the two plaintiffs who filed applications, the defendants point out that eligibility for lower-income housing is not determined until an applicant reaches the head of the waiting list and a vacancy opens up; until then no one can be sure that an applicant would benefit from a favorable decision in this suit. But if the applicant could not sue till there was a vacancy, his suit for an injunction—the premise of which is that the waiting list would be shorter if twice as many apartments were being offered to lower-income families—would be moot as soon as it was ripe.

 These two plaintiffs claim without contradiction to have satisfied the formal requirements for eligibility, to have made an application, and to have been placed on the waiting list, and they will get to the head of the list sooner if the developers are ordered to double the number of apartments offered to lower-income persons. So they stand to gain a real benefit from winning this suit. It is true that even if an applicant is formally eligible and makes his interest clear by filling out an application, the developer to whom he has applied may decide not to rent to him; the developer has considerable discretion in this regard, as emphasized in *Eidson v. Pierce*, 745 F.2d 453, 460–61 (7th Cir.1984), and *Hill v. Group Three Housing Development Corp.*, 799 F.2d 385, 392–93 (8th Cir.1986). Or the applicant may lose interest before he gets to the top of the list. Or the list might be so long, and the applicant so far from the top, that even if the list were shortened because the number of available apartments had doubled he could never hope to reach the top. But these possibilities do not defeat standing. A reasonable probability that a plaintiff will get an apartment that he wants sooner if he wins his suit is a sufficiently tangible expected benefit of suit to confer standing under the liberal principles that prevail nowadays, as

is demonstrated by *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), a factually similar case. If despite the facts we have recited, which make out a prima facie case of standing, neither plaintiff had a reasonable probability of benefiting from a successful conclusion to this suit, this was something for the defendants to show by producing evidence, which they made no effort to do.

Coming to the merits, we first address the claim that the contracts between the developers and IHDA have been broken and that the plaintiffs are entitled to complain about the breach. The questions are intertwined. There is little doubt that the contracts at one time required the developers to set aside 40 percent of the apartments for lower-income families (actually only 32 percent, for reasons explained later, but this makes no difference); for if the 40 percent figure was merely a maximum the contracts contained a tremendous loophole that would have enabled the developers to receive a mortgage subsidy from IHDA even if they never rented a single apartment to a lower-income person. But the nominal parties to the contracts are IHDA and the developers, and they modified the contracts to reduce the percentage to 20 percent. If the plaintiffs are third-party beneficiaries, however, this modification, having been made without their consent, may not have been effective. See Restatement (Second) of Contracts § 311 (1979). Or may have been, as we shall see.

■ A footnote in the plaintiffs' opening brief asserts that the law governing the contract issues is federal common law. As the defendants take no issue with this assertion we shall treat it as a binding stipulation; we have noted many times that parties to a lawsuit are, within broad limits, entitled to determine what law shall govern their dispute. E.g., *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 531 (7th Cir.1985). But since parties cannot confer federal jurisdiction by stipulation, they cannot confer federal jurisdiction by agreeing that their dispute shall be governed by federal law if, were it not for the stipulation, the suit would arise under state law. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1186 (7th Cir. 1985). Now it is true that even if the contractual dispute in this case were governed by state law, it could be deemed a pendant to the plaintiffs' federal statutory and constitutional claims—and this despite the fact that the defendants are different (the heads of HUD and IHDA rather than the developers); for we recognize "pendent party" jurisdiction where the main claim is a federal-question rather than diversity claim. See *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1360 (7th Cir. 1985). (The citation is to one of the separate opinions, but it stated the view of the majority on this point. See *id.* at 1361.) However, the plaintiffs' federal claims were all resolved before trial; so in the absence of special circumstances (not shown here) the district court would have had to relinquish pendent jurisdiction over the contract claims rather than resolve them on the merits. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Hence it becomes important to decide whether they are federal or state in nature.

■ Both *Holbrook v. Pitt*, 643 F.2d 1261, 1270 n. 16 (7th Cir.1981), a suit quite like this, as we shall see, though brought by tenants rather than applicants for subsidized housing under section 1437f, and *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1478–80 (7th Cir.1985), an attempt to sue a contractor for wrongful discharge on the basis of a contract between the contractor and the government, held that the issue of third-party beneficiary status was to be decided as a matter of federal common law; and there is much to be said in support of this result. Section 1437f(b)(2) contemplates that HUD will enter directly or (as here) indirectly (HUD approved the contracts that the plaintiffs allege the developers broke) into contractual relations with developers all over the country, and the nature and feasibility of those contracts may depend in part on who can sue in the event of a breach. The issue is potentially so important to the success of the program—since on its resolution may turn the

amount of lower-income housing actually provided—that we believe that Congress, had it thought about the matter, would have wanted the question to be decided by federal courts applying a uniform principle.

■ Moreover, although in form the question presents itself as whether a state or federal rule of third-party beneficiaries shall be applied to this case, in substance the question is what remedies shall be available for breach of a contract designed to effectuate the program of economically mixed housing. The question whether prospective tenants can sue, as well as signators of the contracts, is much like the question whether a particular federal statute creates an implied right of action in favor of its beneficiaries, a question invariably treated as one of federal law because it involves (under the current view of implied rights of action) interpretation of the statute. See, e.g., *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

*Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), however, must give us pause. Victims of an airline crash brought a diversity suit against the owner of an airport, and argued that they were third-party beneficiaries of a contract between the airport and the Federal Aviation Administration obligating the airport to take certain precautions. The Court held that whether they were third-party beneficiaries was a matter of state, not federal, law. The Court noted that the Solicitor General of the United States had declined to participate in the appeal, advising the Court that the resolution of the plaintiffs' breach of contract claim would not have any direct effect on the United States. See *id.* at 29–30, 97 S.Ct. at 2493–94. That is not true in this case; but it is noteworthy that the Court went out of its way to reject the suggestion that there was a sufficient federal interest in the question "insofar as such lawsuits [i.e., third-party beneficiary suits by the victims of air crashes] might be thought to advance federal aviation policy by inducing compliance with FAA safety provisions." *Id.* at 32, 97 S.Ct. at 2495. The federal interest in the present case could be described in similar terms: an interest in the effect on compliance with the objectives of the program of economically mixed housing if applicants for such housing are allowed to sue to enforce the developers' commitments to IHDA and HUD.

This language in *Miree* is dictum, however, and therefore did not bind us in deciding *Holbrook* and *D'Amato.* The argument for a federal rule is particularly strong in these housing cases; as we suggested earlier, it would be odd to think that a suit by tenants and applicants for federally subsidized housing against developers of such housing for breach of contracts approved by HUD and fundamental to the achievement of HUD's objectives under section 1437f would have to be brought in state court and decided in accordance with state contract law. The case for federal law was much weaker in *Miree,* and we are not obliged to apply all of its language to a case not remotely in the contemplation of the Justices.

■ There is another wrinkle, however. Merely because the issue of third-party beneficiary status is one of federal common law, it need not follow that the suit by a third-party beneficiary to enforce the contract arises under federal rather than state law, thus entitling the plaintiff to bring the suit in a federal rather than state court. The plaintiffs in this case are suing for breach of contract; establishing their status as third-party beneficiaries merely gives them standing to argue breach. But the reasons that persuade us, notwithstanding the dictum in *Miree,* that the issue of third-party beneficiary status should be treated as one of federal law rest fundamentally on the desirability of a uniform interpretation of these contracts (at least of the provisions requiring federally subsidized lower-income housing), and that will best be achieved by allowing suit in federal courts. We do not suggest, however, that there would be federal jurisdiction of a suit unrelated to commitments made in implementation of the Section 8 program—a suit, for example, over compliance with contractual provisions relating only to the

parts of an apartment development that were not committed for rental to lower-income families, hence not involved in the federal subsidy program.

The next question is whether, as a matter of federal common law, the plaintiffs should have a right to maintain a suit on the contract between the developers and IHDA. In *Holbrook* we held that tenants under federal housing programs are third-party beneficiaries of the contracts between HUD (or, by implication, an agent, such as IHDA) and developers of lower-income housing. 643 F.2d at 1269–73. The holding was based on our answering "yes" to the question: "did the contracting parties intend that the third party benefit from the contract?" *Id.* at 1270 n. 17. In view of our approving discussion of the provision in the Restatement of Contracts that "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties," Restatement, *supra*, § 302 (*Holbrook* quoted an earlier version of this provision, but one unchanged in the final version), and our statement that "it is improper to neglect the reasonable expectations of the promisor, since the burden of the agreement to the promisor, and therefore the consideration he will require, may vary according to the number of parties who have enforceable rights under the contract," 643 F.2d at 1270 n. 17, an equivalent formulation of our test is whether the contracting parties intended the third party to have a right to sue in the event of breach. See also *Nguyen v. United States Catholic Conference*, 719 F.2d 52, 55 (3d Cir.1983); *Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 362 (5th Cir.1977). An affirmative answer was at least plausible in *Holbrook;* HUD would hardly wish to undertake the burden of suing for breach of contract every time a developer violated his duty toward a tenant. Granted, this explanation for the decision is in tension with the fact that HUD was opposing the recognition of third-party beneficiary status. But maybe it had just changed its mind; in any event it seemed more sensible to us to make the developer's undertakings to the tenant in the contract with HUD in effect an additional term of the tenant's lease than to place the entire burden of enforcement on HUD, and it was also a result consistent with the statutory objectives.

An inference of third-party beneficiary status is less plausible in the case of a mere applicant for subsidized housing. Cf. *Eidson v. Pierce, supra*, 745 F.2d at 460–62. Although it can be argued that such applicants are not merely incidental beneficiaries of the contracts with the developers, as were the plaintiffs in *D'Amato v. Wisconsin Gas Co., supra*, 760 F.2d at 1480, to give each applicant for subsidized housing the status of a party to the contract would make almost every lower-income person in the United States a potential plaintiff and would thus be inconsistent with the Restatement's provision on third-party beneficiaries of government contracts. See Restatement, *supra*, § 313(2). A developer who signed a contract with IHDA would be buying potential legal trouble not only with the relative handful of lower-income families to which he might actually rent but with all the lower-income families in the region who might desire and be eligible to rent apartments that he had committed to such families. The parties suggested that there might be 30,000 eligible persons in DuPage County alone, one of three counties in which the apartments at issue in this case are located. Of course many such suits might fail for want of standing, but that is not a good argument for deeming the plaintiffs third-party beneficiaries. On the contrary, the original parties to a contract would hardly want to create rights of action in so indefinite a class as to raise a serious question whether the members would actually be allowed to enforce their rights. It is implausible that the developers, IHDA, or HUD ever intended to impose so novel and ill-defined a burden on themselves or that it would advance the objectives of the Section 8 program if they did; so wide a net of liability could make developers reluctant to participate in the program.

We hold that the developers did not assume contractual liability to appli-

cants, but we would affirm the dismissal of the plaintiffs' breach of contract claim even if they had. Unless a contract expressly prohibits the parties from modifying their duties to intended beneficiaries, which the contracts in this case do not do, the parties can modify the contract without any such beneficiary's consent unless and until he justifiably relies on it. See Restatement, *supra*, § 311; *Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 822 (9th Cir.1985); *Detroit Bank & Trust Co. v. Chicago Flame Hardening Co.*, 541 F.Supp. 1278, 1282–83 (N.D.Ind.1982). No reliance, justifiable or otherwise, has been shown or suggested here. The wisdom of the rule is shown by the circumstances of this case. It would be absurd to freeze the developers, IHDA, and HUD into the original terms of the contracts, no matter what the circumstances calling for modification; and frozen they would be, since it would be infeasible, or at least very burdensome, to negotiate a release from all applicants for lower-income housing.

■ And since the contracts were lawfully modified, HUD cannot be faulted for having refused to enforce them according to their original tenor. So we need not decide whether this case falls within any of the exceptions to the rule that agency inaction is inactionable. See *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

■ The next issue is statutory violation. Although section 1437f(b)(2) does not create a private right of action either explicitly or by implication, see *Hill v. Group Three Housing Development Corp.*, *supra*, 799 F.2d at 394–95, the Supreme Court held recently that section 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983, may be used as a vehicle for suing state housing officials, such as the head of IHDA, for depriving lower-income tenants of their rights under federal housing law. *Wright v. City of Roanoke Redevelopment & Housing Authority*, — U.S. —, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987). But there was no violation of the 1974 statute, and the 1981 statute is not retroactive. The 1974 statute says nothing about develop-

ers' having to rent to lower-income families all the apartments they have committed to rent to them, and there is no pertinent legislative history. Of course the developers can't get federal subsidies for apartments not rented to lower-income families, see 42 U.S.C. § 1437f(c)(4), but they have not tried to. Developers who do not rent all the "committed" units free up federal subsidies for other developers.

The concept of economically mixed housing was new in 1974 and no one knew what the optimum mixture was. Housing ordinarily is segregated by income; and though the draftsmen of the 1974 statute wanted to change this, they did not stipulate to a minimum percentage of lower-income people in developments that received rental subsidies under the statute or even require state housing agencies to hold developers to whatever commitments they made. Apartments not rented to lower-income families would be ineligible for rental subsidies, but the developer would not be penalized (at least under the statute) for not renting to as many lower-income families as he had promised to rent to. The statute even contains a provision giving preference to projects in which no more than 20 percent of the units are reserved for lower-income people, see 42 U.S.C. § 1437f(c)(5), which is the percentage to which the developers retreated here, albeit in derogation of their original commitment to IHDA. Congress was evidently alert to the danger of "tipping"; it did not require such high percentages that tipping would become highly likely.

It is true that HUD early on promulgated a regulation which requires developers to rent no more than 20 percent of the units reserved for lower-income housing to ineligible tenants. See 24 C.F.R. § 883.327 (1979, but in force from 1975 on). But this regulation, which (as amended in 1980, see 24 C.F.R. § 883.605) states expressly that a developer who violates it is breaking his contract, represents we believe an exercise of HUD's power to make contracts implementing the statute rather than an interpretation of a statutory duty of developers to adhere to their contractual commit-

ments. (It is the 20 percent leeway in the regulation that caused us to say earlier that the developers' commitment was actually 32 percent rather than 40 percent.) HUD could decide to .extract an ironclad (or, rather, an 80 percent ironclad) commitment from developers, or it could decide to delegate to state agencies such as IHDA the decision of how closely to hold the developers to their commitments in the face of such changed circumstances as experience might reveal. Notice by the way how giving applicants for lower-income housing the status of third-party beneficiaries would reduce HUD's flexibility, unless—as we also believe—contracts can be modified by their original parties without leave of any third-party beneficiaries until the latter have justifiably relied on the original provisions.

When the General Accounting Office (not HUD) discovered that developers were not fulfilling their commitments, it was distressed and applied pressures that eventuated in the 1981 amendment. See for example the ominously entitled Report by the Comptroller General of the United States: Lenient Rules Abet the Occupancy of Low Income Housing by Ineligible Tenants (U.S. Gen'l Accounting Off., CED–81–74, April 27, 1981). But the plaintiffs' argument that the amendment merely clarified the 1974 statute is untenable. The explicit denial of retroactive application argues the contrary, and there is nothing to be clarified about the 1974 statute so far as any obligation to fulfill contractual commitments is concerned: there is no hint of such an obligation. Finally, the legislative history contains no suggestion that the purpose of the 1981 amendment was merely to clarify the original statute.

The repeal of the provisions of the economically mixed housing statute relating to newly constructed and substantially rehabilitated housing, just two years after the 1981 amendment, suggests that IHDA may have been on the right track in allowing the developers to renege on their commitments. Economically mixed housing is a noble idea but also a precarious one. If the percentage of poor people in a project rises too far, the other tenants may leave, and the purpose of the program be defeated. Maybe 20 percent is the highest feasible percentage of poor people (not that all lower-income people as defined by the statute are poor) in such a program, and the GAO's pressure for a higher percentage merely accelerated the program's demise. But the only important point is that the 1974 statute did not contain the inflexible requirement on which the plaintiffs rely.

The last issue is whether IHDA and HUD deprived the plaintiffs of their property without due process of law. Since the defendants did not violate the statute and the plaintiffs had no contract rights, the plaintiffs were not deprived of any entitlement, and hence of any property. Compare *Eidson v. Pierce, supra,* 745 F.2d at 457–64. So this claim fails, too; and the judgment for the defendants must be, and is,

AFFIRMED.