# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

SHOSHONE-BANNOCK TRIBES,
          *Intervenor-Appellee,*

          v.

FMC CORPORATION,
          *Defendant-Appellant.*

No. 06-35429

D.C. No.
CV-98-00406-BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
May 6, 2008—Seattle, Washington

Filed June 27, 2008

Before: Susan P. Graber and Johnnie B. Rawlinson,
Circuit Judges, and Otis D. Wright II,* District Judge.

Opinion by Judge Graber

---

*The Honorable Otis D. Wright II, United States District Court for the
Central District of California, sitting by designation.

**COUNSEL**

Ralph H. Palumbo, Summit Law Group PLLC, Seattle, Washington, for the defendant-appellant.

Paul C. EchoHawk, EchoHawk Law Offices, Pocatello, Idaho, for the intervenor-appellee.

Todd S. Aagaard, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for amicus curiae United States of America.

<hr>

## OPINION

GRABER, Circuit Judge:

In the late 1990s, Plaintiff United States and Intervenor Shoshone-Bannock Tribes ("the Tribes") approached Defendant FMC Corporation, a mining company operating in Idaho, about potential violations of federal and tribal environmental laws. FMC reached an agreement with each party. FMC agreed to pay the Tribes $1.5 million per year in lieu of applying for certain tribal permits. Concerning federal law, FMC and the United States entered into a detailed agreement ("Consent Decree"), which they presented to the federal district court for approval. The district court approved the Consent Decree, and we affirmed. *United States v. Shoshone-Bannock Tribes (FMC Corp.)*, 229 F.3d 1161 (9th Cir. 2000) (unpublished disposition).

In 2001, FMC ceased some of its mining operations, stopped making its annual payments to the Tribes, and refused to apply for certain tribal permits. After negotiations between the Tribes and FMC failed, the Tribes sought enforcement of the Consent Decree in district court. The district court held that the Tribes could enforce the Consent Decree as third-party beneficiaries and that the Consent Decree required FMC to apply for tribal permits. FMC appealed. We hold that the Tribes lack standing to enforce the Consent Decree and, therefore, vacate the district court's orders and remand with instructions to dismiss the action.

## FACTUAL AND PROCEDURAL HISTORY

Until late 2001, FMC produced phosphorous at a plant near Pocatello, Idaho. The plant is located on land within the

Tribes' Reservation, but FMC owns the land in fee. FMC stored the waste generated by the plant in ponds on its property.

In 1997, the United States Environmental Protection Agency ("EPA") contacted FMC to express its concern that FMC was violating federal environmental laws, including the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901-6992k. After negotiations in which the Tribes participated, FMC and the United States reached an agreement. In 1998, the United States filed suit in federal district court and, at the same time, presented to the court a consent decree embodying the government's agreement with FMC. The district court allowed the Tribes to intervene and present objections, but the court ultimately approved the Consent Decree. The Tribes appealed, and we affirmed. *FMC Corp.*, 229 F.3d 1161.

The Consent Decree and its appendices comprise nearly 100 pages and set forth detailed requirements, duties, and rights. Paragraph 1 defines many terms, but also contains a catchall provision that, "[u]nless otherwise expressly provided herein, terms used in this Consent Decree or its Attachments that are defined in RCRA, or in regulations promulgated under RCRA, shall have the meaning assigned to them in RCRA or in such regulations." (Citations omitted.) The terms "parties," "Tribe,"[1] and "person" are relevant to this appeal. The Consent Decree defines "parties" as "the United States (Plaintiff) and FMC Corporation (Defendant)." The Consent Decree defines "Tribe" as "the Shoshone-Bannock Tribe residing on the Fort Hall reservation near Pocatello, Idaho." Nowhere in the text of the Consent Decree is the term "person" defined.

---

[1]The parties, including the Tribes, and the district court use the term "the Tribe*s*" (plural). The Consent Decree uses the term "the Tribe" (singular). There is no suggestion that the terms differ, and we follow the parties' convention except, of course, when quoting the Consent Decree.

The Tribes are mentioned in many places in the Consent Decree. For example, FMC must notify the Tribes before a change in the plant's ownership; the Tribes are entitled to access the plant for certain purposes, including observation, monitoring, and investigation; FMC may "obtain splits of any samples taken by the United States, EPA, the Tribe, or their representatives"; and the Tribes are to receive copies of technical reports, data, and documentation "upon request."

Tribal permits are mentioned in paragraphs 8 and 76:

> 8. *Permits*: Where any portion of the Work requires a federal, state, or tribal permit or approval, Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.
>
> . . . .
>
> 76. This Consent Decree shall not be construed as a ruling or determination of any issue related to any federal, state, tribal, or local permit, if required in order to implement this Consent Decree or required in order to continue or alter operations of the FMC Pocatello Plant (including but not limited to construction, operation, or closure permits required under RCRA), and the Defendant shall remain subject to all such permitting requirements. The Defendant shall be responsible for obtaining any federal, state, or local permit(s) for any activity at the FMC Pocatello Plant, including those necessary for the performance of the work required by this Consent Decree.

Paragraph 77 contains a statement about rights and causes of action:

> 77. Nothing in this Consent Decree is intended either to create any rights in or grant any cause of

action to any person not a party to this Consent Decree, or to release or waive any claim, cause of action, demand, or defense in law or equity that any party to this Consent Decree may have against any person(s) or entity not a party to this Consent Decree.

Paragraphs 55-59 set forth mandatory dispute resolution procedures that must be followed before either party may invoke the district court's jurisdiction. Paragraph 55 states that the "procedures may be invoked by *either* party." (Emphasis added.)

Paragraphs 84 and 85 make explicit the district court's continuing jurisdiction:

84. This Court retains jurisdiction over both the subject matter of this Consent Decree and the Defendant for the duration of the performance of the terms and provisions of this Consent Decree, including its Attachments, for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XVI [¶¶ 55-59] (Dispute Resolution) hereof.

85. The parties retain the right to seek to enforce the terms of this Consent Decree and take any action authorized by federal or state law not inconsistent with the terms of this Consent Decree to achieve or maintain compliance with the terms and conditions of this Consent Decree or otherwise.

Around the same time as the United States-FMC negotiations over federal environmental laws were underway, the

Tribes told FMC that tribal law required FMC to obtain certain tribal permits. FMC settled the tribal permit dispute by agreeing to pay the Tribes a fee of $1.5 million per year, beginning in 1998. FMC paid the fee each year from 1998 through 2001.

The dispute now before us arose when FMC discontinued its operations at the plant in December 2001 and, thereafter, refused to pay the annual $1.5 million fee. The Tribes and FMC disagreed as to whether their agreement required payments to continue after the plant shut down, and negotiations ensued. A key dispute (and one that continues through this appeal) is whether FMC's operations remain subject to tribal jurisdiction.

Negotiations over the fee were unsuccessful and, in 2005, the Tribes filed in district court a "Motion for Clarification of Consent Decree." The Tribes asked the district court to enter an order "clarifying the Consent Decree previously entered in this matter regarding the . . . Tribes['] authority to . . . require FMC to obtain appropriate Tribal permits for work activities conducted at the FMC site."[2] FMC opposed the motion on many grounds, including the ground that, "[b]ecause the Tribes are not a party to the Consent Decree, disputes arising under the Consent Decree are subject to resolution by the United States, FMC, and this Court."

While their motion for clarification was pending, the Tribes filed an "Application for Preliminary Injunction." The Tribes sought an order from the court directing FMC "to immediately apply for and obtain all required Shoshone-Bannock

---

[2]The Tribes also requested "clarification" concerning certain documentation and inspection rights. Before the district court issued any ruling, the Tribes informed the district court that FMC had substantially complied with the Tribes' requests on those issues, and the district court limited the scope of its ruling to the tribal-permitting issue. The Tribes have not challenged the limited scope of the ruling, and the only issue before us is the tribal-permitting issue.

Tribal permits . . . , including a Special Use Permit for hazardous waste storage, treatment, and disposal, and a Building Permit for the demolition activities currently underway at the FMC site." The Tribes acknowledged that they were not a party to the Consent Decree but argued that they had "standing to seek an order enforcing FMC's obligation to obtain Tribal permits, [because] third-party beneficiaries to a consent decree may in some instances enforce its provisions even though not a party to the decree." FMC opposed the application for preliminary injunction on many grounds, including the ground that "[t]he Tribes are not third-party beneficiaries who can seek enforcement of the Consent Decree."

On March 6, 2006, the district court issued an order ("March 6 Order") granting the Tribes' motion for clarification and dismissing as moot the Tribes' application for a preliminary injunction. The court rejected each of FMC's arguments against the Tribes' motion. With regard to the Tribes' standing to enforce the Consent Decree, the district court found that the Consent Decree conferred at least six different benefits on the Tribes and concluded: "By conferring numerous benefits on the Tribes, the parties to the Decree make it clear that the Tribes are an intended—and not merely an incidental—beneficiary." The court rejected FMC's argument that paragraph 77 of the Consent Decree prevents enforcement by the Tribes and concluded that:

> (1) the Consent Decree requires FMC to apply for permits that the Tribes specifically identify as being required; (2) FMC may not refuse to apply for permits on the ground that FMC does not believe the permits to be applicable; (3) the Tribes have specifically identified the permits listed in the letter of December 9, 2005; (4) FMC is required to apply to the Tribes for the permits listed in the letter of December 9, 2005; ([5]) FMC may make its challenges to the applicability of the permits in the Tribal administrative process, and must exhaust that pro-

cess, or identify a legal exception to the exhaustion doctrine, before seeking relief in this Court.

The district court's order also noted:

> [A]bout a week before this Court's hearing on the Tribes' motions, FMC filed its Certificate of Completion of the "Work" under the Consent Decree with the EPA. All parties agree that the next step is for the EPA to determine whether that "Work" is in fact complete. If it is, the EPA will issue to FMC an Acknowledgment of Completion.[3]

After the March 6 Order, FMC began the tribal permit application process, but it also filed a motion asking the district court to reconsider its order. According to the district court, while FMC's motion to reconsider was pending, "the Tribes' counsel told FMC's counsel that the Tribes were imposing a deadline on FMC of May 10, 2006, to elect either (1) to drop its appeal and pay a $1.5 million fee, or (2) if it wanted to maintain its appeal, to pay a weight-based fee that could exceed $100 million."[4] As that deadline approached, FMC filed a motion to stay the March 6 Order pending the district court's ruling on the motion to reconsider, and it also filed a protective notice of appeal of the March 6 Order. The district court granted FMC's motion to stay the March 6 Order "for a limited period of time until the Court can review the Tribes' briefing."

---

[3]The record is silent on whether the United States issued the Acknowledgment, declined to issue it, or deferred deciding the question pending the outcome of this appeal. The district court's docket sheet reflects that, whatever the United States' action, the district court has not been asked to rule on the Certificate or the Acknowledgment, if any exists.

[4]The latter option calculated the fee based on the weight of the waste FMC stored on site. The Tribes estimated that the fee could exceed $100 million.

On December 1, 2006, the district court issued a memorandum and order lifting the stay and denying FMC's motion to reconsider. FMC filed a timely appeal from that order. We consolidated the two appeals and denied FMC's motion to stay the March 6 Order pending appeal.[5]

## STANDARDS OF REVIEW

We review de novo the district court's interpretation of a consent decree. *Gates v. Gomez*, 60 F.3d 525, 530 (9th Cir. 1995). We generally "give deference to the district court's interpretation based on the court's extensive oversight of the decree from the commencement of the litigation to the current appeal." *Id.* (internal quotation marks omitted). Whether a party has standing to enforce a consent decree under the third-party beneficiary doctrine, however, is an "issue[ ] of law that must be reviewed de novo." *Hook v. Ariz., Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992).

## DISCUSSION

[1] "A district court retains jurisdiction to enforce its judgments, including consent decrees." *Id.* The threshold issue is whether the Tribes have standing to enforce the Consent Decree. The Tribes concede, as they must, that they are not a "party" to the Consent Decree because the Consent Decree defines "parties" as the United States and FMC. Relying on our decision in *Hook*, the Tribes argue that they are entitled to enforce the Consent Decree anyhow, as intended third-party beneficiaries.

[2] "Contract principles are generally applicable in our analysis of consent decrees, provided contract analysis does

---

[5]We then granted a motion to dismiss the second appeal, "because it is unnecessary and duplicative of" the first appeal. The notice of appeal in the second appeal was "deemed an amended notice of appeal in" the first appeal. Both of the district court's orders are therefore before us.

not undermine the judicial character of the decree. Key to the present case, consent decrees are construed as contracts for purposes of enforcement." *Hook*, 972 F.2d at 1014 (citation omitted); *see also United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("*Without question courts treat consent decrees as contracts for enforcement purposes.* A consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree.").

**[3]** In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975), the Supreme Court considered a complex securities case that involved a consent decree between the government and a private company. In reaching its conclusion that the plaintiffs—non-parties to the consent decree—could not enforce the consent decree at issue, the Court stated: "[A] well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it."

In *Hook*, we carved out an exception to that sweeping and clear statement by the Supreme Court. Eleven prison inmates had filed a suit against the Arizona Department of Corrections in 1973, and the parties settled and entered into a consent decree establishing certain rights for the inmates. *Hook*, 972 F.2d at 1013. Seventeen years later, the Department changed its regulations, and 265 inmates sought to enforce the 1973 consent decree. *Id.* at 1013-14. We held that, even though none of the original 11 inmates joined the 1990 action, the other inmates nevertheless could enforce the consent decree as intended third-party beneficiaries. *Id.* at 1014-15.

We acknowledged that the Supreme Court's rule in *Blue Chip Stamps* was broad, but we limited its reach:

> [A] more thorough analysis reveals that the standing rule from *Blue Chip Stamps* prohibits only *incidental*

third party beneficiaries from suing to enforce a consent decree. In *Blue Chip Stamps*, the government had been the plaintiff that compelled the earlier consent decree, and the private beneficiaries of the decree later sought to bring an action under the decree. At the time the government entered into the consent decree, it was well-settled that only the Government can seek enforcement of its consent decrees. Because the Government knew at the time it entered the consent decree that the private beneficiaries it intended to benefit would be unable to bring actions to enforce the consent decree, the private beneficiaries were only incidental third party beneficiaries.

This reading of *Blue Chip Stamps* is consistent with the principle that in construing consent decrees, courts use contract principles. In contract law, third party beneficiaries of the government's rights under a contract are normally assumed to be only incidental beneficiaries and are precluded from enforcing the contract absent a clear expression of a different intent. Under contract principles, the private parties seeking to enforce the government's rights in *Blue Chip Stamps* were incidental third party beneficiaries. The holding in *Blue Chip Stamps* is thus limited to incidental beneficiaries or beneficiaries of consent decrees where the government was the plaintiff; it does not apply to intended third party beneficiaries.

Moreover, if *Blue Chip Stamps* were read broadly to preclude even intended third party beneficiaries from enforcing a consent decree, it would create a direct conflict with [Federal] Rule [of Civil Procedure] 71. Rule 71 clearly allows intended third party beneficiaries to enforce consent decrees, and *Blue Chip Stamps* should be read to avoid eviscerating Rule 71.

*Hook*, 972 F.2d at 1015 (citations, internal quotation marks, and alterations omitted).

**[4]** In short, under Ninth Circuit precedent, *incidental* third-party beneficiaries may not enforce consent decrees, but *intended* third-party beneficiaries may. Most other circuits are in accord with our restrictive reading of the Supreme Court's statement in *Blue Chip Stamps*. *See Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir. 2002) ("In order for a third party to be able to enforce a consent decree, the third party must, at a minimum, show that the parties to the consent decree not only intended to confer a benefit upon that third party, but also intended to give that third party a legally binding and enforceable right to that benefit. This standard applies whether or not the government is a party to the consent decree." (citation omitted)); *Floyd v. Ortiz*, 300 F.3d 1223, 1226 (10th Cir. 2002) (identifying the circuit split and following, without analysis, the majority position that "intended third-party beneficiaries of consent decrees have standing to enforce those decrees"); *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 286 (D.C. Cir. 1993) (following *Hook*); *Berger v. Heckler*, 771 F.2d 1556, 1565 (2d Cir. 1985) ("Although there is substantial authority for the proposition [stated in *Blue Chip Stamps*], we think that this authority was not intended to preclude nonparties from intervening to enforce a consent decree where otherwise authorized by the federal rules of civil procedure."). *But see Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir. 1994) (en banc) ("The plain language of *Blue Chip* indicates that even *intended* third-party beneficiaries of a consent decree lack standing to enforce its terms. Although other circuits have held to the contrary, we are unable to join them until the Supreme Court revisits the unequivocal language of *Blue Chip*." (citations omitted)).

The Tribes argue that, under *Hook*, they are intended third-party beneficiaries and not merely incidental third-party beneficiaries. The Tribes point out that they were involved in the

negotiations concerning the Consent Decree; that the Consent Decree refers to them many times; that the Consent Decree gives the Tribes certain "rights," such as notification rights and rights of access to FMC's property for specified purposes; and that the district court allowed the Tribes to intervene in the case and to object to the Consent Decree. In the Tribes' view, those facts support the conclusion that they are intended beneficiaries and not merely incidental beneficiaries.

We are not persuaded. Two key facts undermine the Tribes' argument: the identity of the parties to the Consent Decree and the text of the Consent Decree.

Unlike in *Hook*, the government is a party to the consent decree in this case. In *Hook*, we distinguished *Blue Chip Stamps* in part because the government was a party to the consent decree in *Blue Chip Stamps*. *Hook*, 972 F.2d at 1015. *Hook* plausibly can be read to hold that, when the government is the plaintiff, third-party beneficiaries *never* have standing to enforce the consent decree. *See id.* (concluding that "[t]he holding in *Blue Chip Stamps* is thus limited to incidental beneficiaries or *beneficiaries of consent decrees where the government was the plaintiff*; it does not apply to intended third party beneficiaries." (emphasis added)). There is some logic to that position; unlike in *Hook*, where the original plaintiffs lacked any remaining interest in enforcing the decree, the government has an ongoing incentive to enforce its contracts. But *Hook* also can be interpreted to hold only that, when the government is the plaintiff, third-party beneficiaries are *presumed* to be incidental in the absence of a clear expression of a different intent in the consent decree. *See id.* ("In contract law, third party beneficiaries of the government's rights under a contract are normally *assumed* to be only incidental beneficiaries and are precluded from enforcing the contract absent a clear expression of a different intent." (emphasis added)). We need not resolve the ambiguity in *Hook*. Assuming, without deciding, that there is only a legal presumption that the Tribes are incidental third-party beneficiaries, the Tribes can-

not overcome that presumption because the Consent Decree contains no clear expression of a different intent.

**[5]** The Consent Decree does contain a paragraph that discusses rights of non-parties to the Decree, but that paragraph *disclaims* an intent to grant rights to third parties. Paragraph 77 states in full:

> Nothing in this Consent Decree is intended either to create any rights in or grant any cause of action to any person not a party to this Consent Decree, or to release or waive any claim, cause of action, demand, or defense in law or equity that any party to this Consent Decree may have against any person(s) or entity not a party to this Consent Decree.

**[6]** In our view, paragraph 77 clearly expresses the parties' intent that third parties *cannot* enforce the Consent Decree. Several courts have interpreted similar wording to preclude enforcement by third parties. *See, e.g.*, *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (contractual text: " 'This Agreement . . . , except for the provisions of Article II and Article 5.08, [is] not intended to confer upon any person other than the parties any rights or remedies.' " (alteration in original)); *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003) (contractual text under the heading " 'No Third Party Beneficiaries' ": " 'This agreement [and other specified agreements] . . . are not intended to confer upon any person other than the parties any rights or remedies.' "); *W. Alton Jones Found. v. Chevron U.S.A. Inc. (In re Gulf Oil)*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989) (contractual text: " 'This agreement . . . is not intended to confer upon any other person any rights or remedies.' "). Factoring in the presumption against third-party enforcement for government consent decrees, there is no question that the Tribes lack standing to enforce the Consent Decree.

The text of paragraph 77, as noted, disclaims enforcement rights in "any person not a party to [the] Consent Decree."

The Tribes argue that the disclaimer in paragraph 77 does not apply to them, because they are a sovereign and not a "person." Even overlooking the natural reading of the text that limits enforcement rights to the parties only, the Tribes' argument fails on its own terms.

[7] The Consent Decree does not define the term "person." But the Consent Decree requires that all undefined terms be given the meaning assigned to them by RCRA and RCRA regulations. RCRA defines the term "person" this way:

> *The term "person" means* an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, *municipality*, commission, political subdivision of a State, or any interstate body and shall include each department, agency, and instrumentality of the United States.

42 U.S.C. § 6903(15) (emphases added). In turn, RCRA also defines "municipality":

> *The term 'municipality' (A) means* a city, town, borough, county, parish, district, or other public body created by or pursuant to State law, with responsibility for the planning or administration of solid waste management, or *an Indian tribe or authorized tribal organization* or Alaska Native village or organization, and (B) includes any rural community or unincorporated town or village or any other public entity for which an application for assistance is made by a State or political subdivision thereof.

*Id.* § 6903(13) (emphases added). Following the nested definitions, the term "person" is defined by the Consent Decree to include Indian tribes, such as the Tribes in this case.

The Tribes argue that this method of ascertaining the definition of "person" is wrong because it "requires the Court to go beyond the definition of 'person' in 42 U.S.C. § 6903(15) and engage in a two step reading of the definition of both 'person' and 'municipality' to get to inclusion of Indian tribes. The Tribes are not within the direct definition of 'person' under RCRA." Nested definitions in statutory text are very common. The Tribes provide no authority, and we have discovered none, for the proposition that two-step definitions have any less force than one-step definitions.

It is true that, as the Tribes point out, the Consent Decree's definition of the term "Tribe" does not provide that the Tribes are a "person." But that fact is unilluminating. The relevant inquiry looks to the definition of "person," not the definition of "Tribe." The definition of "Tribe" in the Consent Decree merely identifies the relevant tribe; one would not expect it to contain an exhaustive list of all the broad categories to which it belongs.

The district court found important paragraph 77's "fail[ure] to mention the term 'third-party beneficiary.' It would have been easy to name the doctrine and exclude it from application." The district court did not cite any authority, and we know of none, supporting the proposition that a consent decree must use, define, or disclaim the term "third-party beneficiary." And, of course, a contract can use whatever terms the parties wish to express their agreement. *See, e.g.*, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210-12 (9th Cir. 1999) (finding that the third parties were not intended beneficiaries without discussing whether the term "third-party beneficiary" was used in the contract). No inference can be drawn in the Tribes' favor from the fact that the Consent Decree stated that "[n]othing . . . is intended . . . to create any rights" instead of "nothing is intended to create third-party beneficiary rights." The former is a perfectly clear construction and, in fact, is naturally understood to be an even

more emphatic disclaimer of *any* rights, third-party or otherwise.

An additional consideration supports the conclusion that paragraph 77 applies to the Tribes. The Consent Decree specifies mechanisms for resolving disputes. Before the parties can invoke the district court's jurisdiction, they must proceed through a number of steps. But those provisions apply only to "either party," *i.e.*, not the Tribes. If the Tribes could enforce the Consent Decree directly, the Tribes could hale the parties into federal court without invoking any of the prescribed dispute resolution mechanisms. We do not think that the Consent Decree could have intended to grant a broader range of dispute-resolving rights to the Tribes than to the parties themselves. *See Williston on Contracts* § 37.23, pp. 147-49 (4th ed. 2000) ("It is clear that a third party beneficiary's right to enforce a contract cannot rise higher than the rights of the contracting party through whom he claims." (internal quotation marks omitted)).

The Tribes' final argument is one of policy: They contend that reading the Consent Decree in a manner that leaves them incapable of enforcing the Decree directly "would render the Tribe's rights under the Consent Decree utterly meaningless." The district court expressed this sentiment as well.

**[8]** The key flaw in that tempting argument has been addressed by many authorities. By definition, all third-party beneficiaries receive a benefit from a consent decree; otherwise they would not be beneficiaries. But, as explained by the D.C. Circuit, "[w]hen a consent decree or contract explicitly provides that a third party is not to have enforcement rights, that third party is considered an incidental beneficiary even if the parties to the decree or contract intended to confer a direct benefit upon that party." *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 159 (D.C. Cir. 1998); *see also Consol. Edison*, 426 F.3d at 528 (rejecting the right of a third party to enforce a contract because "the parties to the Agreement clearly created a third-

party right, but just as clearly they took pains to assure that the right was limited . . . [and] not a right to sue"); *McKesson HBOC*, 339 F.3d at 1091-92 ("The . . . Agreement's express rejection of any intent to create a class of third-party beneficiaries in the shareholders . . . [means that,] [a]t most, the . . . shareholders might be considered incidental third-party beneficiaries, a status that provides no legal benefit."); *Pure Country*, 312 F.3d at 958 ("In order for a third party to be able to enforce a consent decree, the third party must, at a minimum, show that the parties to the consent decree not only intended to confer a benefit upon that third party, but also intended to give that third party a legally binding and enforceable right to that benefit."); 9 *Corbin on Contracts* § 44.6, p. 68 (Rev. ed. 2007) (stating that it is "obvious" that, "where the terms of the contract expressly state the intention of the promisee and promisor concerning the enforceable rights of third parties, the critical question of whether the parties intended the third party to have such a right is easily answered").

In closing, we note that, during the pendency of this appeal, FMC began the process of applying for tribal permits, which is the main relief that the Tribes have sought in this action. At oral argument, the Tribes expressed their concern that, if we were to hold that the Tribes lack standing to enforce the Consent Decree, FMC would withdraw its permit applications and undo the progress made to date on the proper resolution of this dispute. In response to questioning from the panel, FMC's lawyer represented to the court that FMC understands that it has the obligation to continue, and will continue, with the current tribal proceedings to their conclusion. We accept that statement from counsel as binding on FMC.[6]

---

[6]Other remedies may exist, even though the Tribes cannot enforce the Consent Decree. For example, the United States is a party to the Consent Decree. Its right to enforce the Consent Decree is unaffected by paragraph 77. So far, the United States has remained unwilling to support the Tribes' cause, but the Tribes can try to persuade the United States to read the Consent Decree as they do and then enforce it against FMC.

Orders of March 6, 2006, and December 1, 2006, VACATED; REMANDED with instructions to dismiss this action. Costs on appeal are awarded to FMC Corporation.

---

Additionally, if the United States certifies that FMC has completed the relevant work and presents that certification to the district court for approval, the district court could allow the Tribes to intervene and object. That is what occurred when an earlier dispute arose in 2000.

The merits of those and other potential alternatives are not before us, and we express no view on them.